78 F.3d 595
 77 A.F.T.R.2d 96-1157
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Karola JAMISON, Defendant-Appellant.
 No. 94-10591.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 9, 1996.
Decided Feb. 28, 1996.
 
 1
 Before: SCHROEDER and TROTT, Circuit Judges, and REED, District Judge*.
 
 
 2
 MEMORANDUM**
 
 I. Overview
 
 3
 Karola Jamison was convicted by a jury of mail fraud, wire fraud and filing false tax returns, and was sentenced to 71 months imprisonment. She raises five points on appeal. Four relate to the validity of her conviction, one to the propriety of her sentence. We affirm Jamison's conviction, vacate her sentence, and remand the case for resentencing.
 
 II. Facts[1]
 
 4
 Jamison convinced dozens of people to invest in what she called a "collateralized funding program," explaining that their money would be used to provide "commitment fees" for large loans between banks and third parties. The investment period was to be brief (between 30 and 90 days), and Jamison promised monthly interest payments of between 5% and 20%. She assured her investors that their principal would be placed in a trust or escrow account, so that only the interest was at risk if the contemplated "funding transactions" didn't take place.
 
 
 5
 Unfortunately for the investors, there was no trust or escrow account, and no "funding transaction" ever occurred. Jamison put the investors' money in her checking account, used it for personal expenses (including downpayments on a house, a condominium and two cars), and kept the operation afloat by bringing in new investors. Ultimately, she took in about $1.4 million. Only about $440,000 was returned to her investors.
 
 
 6
 Jamison characterized this as an honest business venture gone awry. The government, however, called it a Ponzi scheme, and the jury agreed, finding Jamison guilty of 32 counts of mail fraud, wire fraud and filing false income tax returns. As noted, Jamison makes four arguments for reversal of her conviction and one for vacation of her sentence.
 
 III. The conviction
 
 7
 A. Prosecutorial "vouching"
 
 
 8
 Richard Pryke invested in Jamison's "collateralized funding program," and convinced others to invest in it, too. Pryke borrowed money to finance his participation in the scheme, and pled guilty to bank fraud in connection with that loan. He testified for the government at Jamison's trial. On direct examination, the prosecutor brought out the fact that Pryke had recently pled guilty and asked him
 
 
 9
 [h]ave you entered into a plea agreement with the United States?
 
 
 10
 A. Yes, I have.
 
 
 11
 Q. And what do you understand the terms of that agreement to be?
 
 
 12
 A. The agreement was that I will tell the truth, as I know it; tell everything that I know about the collateralized funding program and my involvement in it. And, if in fact, I did that, then the prosecuting attorney would consider recommending or may consider recommending leniency to the judge at my sentencing. That's the only thing that was ever--was ever discussed.
 
 
 13
 Q. And I'm that prosecuting attorney?
 
 
 14
 A. Yes, you are.
 
 
 15
 E.R. 17-18. Jamison's counsel requested a mistrial, arguing that the prosecutor, by soliciting from Pryke the fact that his plea agreement obligated him to testify truthfully, had improperly vouched for Pryke's credibility. E.R. 19. The judge discussed the matter with the lawyers at some length, E.R. 18-28, and, analyzing Pryke's exchange with the prosecutor in light of United States v. Necoechea, 986 F.2d 1273 (9th Cir.1993), decided to give the jury a cautionary instruction. E.R. 27. When the jurors returned to the courtroom, the judge told them:
 
 
 16
 [L]adies and gentlemen, I want to make something very clear to you. During the testimony elicited from this witness prior to the recess, there was a question asked of him regarding his requirements under his plea agreement, and during that question the witness testified that he believed he had a requirement under his plea agreement to testify truthfully.
 
 
 17
 Now, in asking that question I want to ensure you [sic] and to instruct you carefully that the United States does not stand behind this witness, vouch for this witness' [sic] credibility, or any other witness that may be presented. It is entirely up to you and for your consideration alone as to the credibility of this witness and it must be based upon your determination of the witness' [sic] credibility, independent of any other statements by the government or the government's counsel. Therefore, the statement--the testimony of the witness may be carefully considered by you, but it is not to be regarded as--because the government posed the question as some type of assurance or in any way a [sic] indication to you that the government believes or stands behind the testimony of this or any other witness. I also want to make something very clear to you: By instructing you this way, I am not calling into question the credibility of the witness. I'm not suggesting to you the Court does not believe his testimony or believe--believes his testimony, either one. All right? I am just reminding you of the requirements of the law, and that is that the United States may not vouch or stand behind the credibility of any witness--this or any other witness.
 
 
 18
 E.R. 29-30.
 
 
 19
 A prosecutor may not "vouch" for a witness through "personal assurances of the witness's veracity" or by expressing a belief in the witness's credibility, Necoechea, 986 F.2d at 1276, and, more specifically, may not bring out, on direct examination, the truthfulness requirement of the witness's plea agreement, United States v. Lew, 875 F.2d 219, 223 (9th Cir.1989), unless the witness's credibility was attacked during opening statement. Necoechea, 986 F.2d at 1279.[2] As Pryke's credibility had not been challenged during opening statements, E.R. 26, there was arguably, as the district court judge put it, E.R. 27, a "shade of vouching" in prosecutor's eliciting testimony about the truthfulness requirement of the plea agreement.
 
 
 20
 There is "no bright-line rule about when vouching will result in reversal." Id. at 1278. The court instead considers "a number of factors," including:
 
 
 21
 the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.
 
 
 22
 Id. Because Jamison's counsel objected at trial, the question is whether, "considered in the context of the entire trial," it appears more probable than not that the vouching affected the jury's verdict. See United States v. Simtob, 901 F.2d 799, 806 (9th Cir.1990).
 
 
 23
 This court has found vouching clearly more serious than that at issue here to be harmless beyond a reasonable doubt. In Shaw, for example, the prosecutor vouched for a government witness in his opening statement, telling the jury that
 
 
 24
 we have, basically, agreed, we, meaning the prosecutor and the government have agreed that as long as he is truthful we will present his truthful cooperation to the local prosecutors so they can decide what value it has....
 
 
 25
 829 F.2d at 716. The statement was held to be vouching, id. at 717, and was cured only with an instruction after closing argument, but was nevertheless held harmless. Id. at 718. And in Monroe, the witness's obligation to testify truthfully was brought out much more forcefully than it was in this case, 943 F.2d at 1013 n. 4, and was cured, it seems, with only a standard instruction telling the jury that it should scrutinize the witness's testimony especially carefully. Id. at 1014 n. 7. Though the court found that there was no vouching because the government introduced the "truthful testimony" aspect of the plea agreement only after the witness's credibility had been attacked, it noted that any vouching which had occurred was harmless, given the instruction to the jury and the "brief and nonrecurring" nature of the reference to the plea agreement. Id.
 
 
 26
 It seems most unlikely that any vouching which occurred here affected the jury's verdict. For one thing, the district judge indicated, E.R. 26, that there was already substantial independent evidence of Jamison's guilt by the time Pryke testified. Further, "[p]rompt and effective action by the trial court"--an "appropriate curative instruction [ ] to the jury," for instance--"may neutralize the damage" done by vouching, Simtob, 901 F.2d at 806, and in this case the district judge, though he doubted that the prosecutor's question constituted anything more than a "shade" of vouching, E.R. 27, immediately gave the lengthy and specific curative instruction set forth above. In these circumstances, it was not error to deny Jamison's motion for a mistrial, and it cannot plausibly be argued that the vouching probably affected the jury's verdict.
 
 B. Hearsay evidence
 
 27
 The government moved, E.R. 33, for admission of "Exhibit 900.0," E.R. 37-52, a sixteen-page chart summarizing deposits into, and withdrawals from, Jamison's checking account between March 1988 and March 1990. The district court judge allowed the chart into evidence as a summary. E.R. 34.
 
 
 28
 1. Incorporation of hearsay from checking account records
 
 
 29
 Jamison's counsel objected to admission of the chart because he thought it "incorporate[d] hearsay information from the checking account." E.R. 33. But the chart, as the FBI agent who prepared it testified, E.R. 33, and as Jamison concedes in her reply, see Appellant's Rep.Br. at 1, was based on checks already admitted into evidence, see Supp.E.R. 12, and could therefore contain hearsay "from the checking account" only to the extent that the checking account records themselves contained hearsay. Jamison has not explained what hearsay was contained in those records, and has thus failed to show that the chart "incorporated" any hearsay at all.
 
 
 30
 2. Identification of "investments"
 
 
 31
 Jamison makes a second argument related to Exhibit 900.0, based on both the confrontation clause and a different form of the hearsay objection. Each deposit into Jamison's checking account was categorized on the chart as either an "investment" or "other funds," see E.R. 37-52, the latter term referring to money received in the account which was "not derived from investors." E.R. 35. Twenty-two checks deposited into the account, from sixteen individuals, were categorized as "investments" rather than "other funds," Jamison explains, not on the basis of "any underlying in-court testimony" from their makers "that they had in fact ever made any investments," Appellant's Rep.Br. at 1, but, instead, on the basis of the FBI's identification of those sixteen individuals as "investors." And that identification was made, explained the FBI agent who prepared the chart, "through interview[s] and documentation that we have." E.R. 35.[3] This, Jamison argues, violated both the hearsay rule and the confrontation clause.
 
 
 32
 The argument is not persuasive. Jamison made no hearsay objection on this basis,[4] and no confrontation clause objection at all.[5] The admission of the chart is therefore reviewed for plain error. United States v. Nazemian, 948 F.2d 522, 525 (9th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992) (confrontation); Gomez-Norena, 908 F.2d at 500 (hearsay). "Plain error" exists only if there is a "high probability that the error materially affected the jury's verdict." United States v. Hoac, 990 F.2d 1099, 1109 (9th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1075, 127 L.Ed.2d 392 (1994). "In applying this standard, the magnitude of the alleged error is judged in light of the evidence as a whole to determine the degree of prejudice to the defendant resulting from the error." United States v. Jarrad, 754 F.2d 1451, 1457 (9th Cir.), cert. denied, 474 U.S. 830, 106 S.Ct. 96, 88 L.Ed.2d 78 (1985). If error occurred, it will be deemed harmless rather than plain "where other 'substantial, independent and credible evidence' of the defendant's guilt is presented, which 'overwhelm[s] whatever incriminating aspects the [inadmissible] statements might have had if considered in isolation." Id. (citations omitted).
 
 
 33
 In categorizing the twenty-two checks at issue here as having been made for "investment" purposes, the FBI agent who prepared the chart relied on out-of-court statements to that effect by the sixteen individuals who issued the checks. The chart thus incorporated hearsay, just as if the agent himself had repeated those statements from the witness stand. See United States v. Pelullo, 964 F.2d 193, 204-05 (3d Cir.1992); United States v. Goss, 650 F.2d 1336, 1344 n. 5 (5th Cir. Unit A July 1981).
 
 
 34
 That is so, however, only if the statements were offered for the truth of the matter: that the individuals who issued these checks to Jamison did so in the course of "investing" in her "funding" program, and not for some other reason. But this distinction seems to have made no difference in the case. Jamison herself concedes that "the [chart] was not explicitly offered to prove the truth of its content," Appellant's Br. at 19, and the government points to its closing argument, Supp.E.R. 6-8, to show that there was no significance to the distinction made on the chart between "investment" deposits into Jamison's account and "other funds" deposited into that account. "Exhibit 900," the government explains, was used only to show that "there was no trust account, [and that] the money went for personal expenses, and the payment of 'dividends' and alleged return of principal." Appellee's Br. at 23-24.
 
 
 35
 Moreover, even if the check issuers' statements to the FBI had been offered through Exhibit 900 for the truth of the matter stated, i.e., to show that they intended their deposits as "investments," and were therefore admitted in violation of both the hearsay rule and the confrontation clause, the error would be harmless because the other evidence of Jamison's guilt was overwhelming. Many "investors" in her "collateralized funding program" did testify, and there is no serious dispute about the amount of money deposited into Jamison's account, the amount withdrawn and spent on personal effects, the timing of these deposits and withdrawals, and the fact that no "trust" or "escrow" account ever existed. Her scheme took in at least $1.4 million from at least 69 victims; only about $440,000 was repaid. By contrast, the twenty-two deposits whose identification as "investments" Jamison claims was improper totalled only about $186,000, from sixteen individuals. Given the other evidence of Jamison's guilt, it cannot plausibly be argued that the jury's verdict was probably affected by the characterization of those deposits as "investments" rather than "other funds."
 
 3. Fed.R.Evid. 1006
 
 36
 Finally, Jamison argues that the chart, even if it was based entirely on evidence already admitted, should not itself have been admitted into evidence or allowed into the jury room. "When considering the admissibility of exhibits of this nature," this court has explained,
 
 
 37
 it is critical to distinguish between charts or summaries as evidence and charts or summaries as pedagogical devices. Charts and summaries as evidence are governed by Federal Rule of Evidence 1006, which permits the introduction of charts, summaries, or calculations of voluminous writings, recordings, or photographs which cannot conveniently be examined in court. In contrast, charts or summaries of testimony or documents already admitted into evidence are merely pedagogical devices, and are not evidence themselves.
 
 
 38
 ... [S]uch pedagogical devices should be used only as a testimonial aid, and should not be admitted into evidence or otherwise be used by the jury during deliberations.
 
 
 39
 United States v. Wood, 943 F.2d 1048, 1053 (9th Cir.1991) (internal quotation marks omitted) (citations omitted). When the district court admitted the chart as a "summary," E.R. 34, it could only have been referring to Rule 1006. Because the chart at issue here was based on bank records already admitted into evidence, the chart itself should not have been admitted.
 
 
 40
 Jamison, however, made no objection at trial to the chart's admission into evidence, and its admission is therefore reviewed for plain error. Jamison had a full opportunity to cross-examine the FBI agent who prepared the chart, and thus a full opportunity to "challenge the facts, figures, calculations, computations and methods" upon which the chart was based. See United States v. Krasn, 614 F.2d 1229, 1238 (9th Cir.1980). Except for the characterization of a few deposits as "investments," discussed above, the chart was based entirely on facts already in evidence. It was not plain error to admit the chart. See id.; see also United States v. Gardner, 611 F.2d 770, 776 (9th Cir.1980); United States v. Abbas, 504 F.2d 123, 125 (9th Cir.1974), cert. denied, 421 U.S. 988, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975).
 
 
 41
 C. Appearance of bias by the district court judge
 
 
 42
 Jamison, citing assorted comments made by the district judge during the trial, complains that he "appeared to be siding with the prosecution" against her, Appellant's Br. at 21, and otherwise "projected the appearance of partiality to the jury." Id. at ii. Nonsense. Far from conveying the appearance of bias, the comments complained of, when read in context, make clear that the district judge was fair throughout.
 
 1. The judge's questioning of Rosa Belacio
 
 43
 Rosa Belacio, Jamison's former maid, testified for the government and used the word "swindle" several times, referring to Jamison's conduct. E.R. 54-56. The district judge himself then repeated the word three times. E.R. 57. In so doing, Jamison complains, the judge prejudiced the jury against her.
 
 
 44
 The record tells a different story. This case involved financial wrongdoing, so whether Belacio meant to say "swindle" was an important point, and Belacio, according to the trial judge, had a "heavy German accent." See Supp.E.R. 23. In full, the colloquy was unobjectionable:
 
 
 45
 Court: You have used a word here that I know you have something of a heavy German accent.
 
 
 46
 Witness: Yeah.
 
 
 47
 Court: And you have used the word a couple of times. Is that what you intend to say: Swindle. Is that you [sic] are saying: Swindle?
 
 
 48
 Witness: Yeah.
 
 
 49
 Court: Swindle?
 
 
 50
 Witness: Yeah.
 
 
 51
 Court: Okay. All right.
 
 
 52
 Supp.E.R. 23; E.R. 57.
 
 
 53
 2. The district judge's questioning of Jamison
 
 
 54
 Jamison next argues that the district judge interrupted her testimony on direct examination on several occasions, "interposing hostile questions in the manner of a prosecuting attorney." Appellant's Br. at 22.[6] Here is the exchange:
 
 
 55
 Court: What was your monthly rental payment?
 
 
 56
 Witness: I had put down $30,000, and it later on turned out to be between 3 and $4,000 a month.
 
 
 57
 Court: What was the purchase price that you were going to purchase the home for?
 
 
 58
 Witness: 1.9 million.
 
 
 59
 Court: And what type of funding were you to get, were you seeking?
 
 
 60
 Witness: 4 million.
 
 
 61
 Court: Okay, maybe I missed something here.
 
 
 62
 Witness: Yeah, that my request was for the residence at Hawaii Loa Ridge and a condo at the Colony Beach Tower.
 
 
 63
 Court: Okay, in other words ...
 
 
 64
 Witness: So it was all put together.
 
 
 65
 Court: All right, how much were you going to purchase the Colony Beach Tower for?
 
 
 66
 Witness: For approximately another million.
 
 
 67
 Court: All right, so that's 1.9; that's 2.9 million.
 
 
 68
 Witness: Three million, yes, roughly.
 
 
 69
 Court: And then what was the other million for?
 
 
 70
 Witness: Well, that was just the amount that would have come out of that transaction for the commitment fee that I had put up.
 
 
 71
 Court: So you were seeking to borrow $4 million to purchase $3 million worth of real estate?
 
 
 72
 Witness: Right.
 
 
 73
 Court: Okay. Now, my next question, of course, is where was the other million dollar, [sic] what was that for?
 
 
 74
 Witness: Well, I had to repay the money that I had borrowed.
 
 
 75
 Court: From who?
 
 
 76
 Witness: I had borrowed money for the commitment fee.
 
 
 77
 Court: Okay, from who?
 
 
 78
 Witness: From different friends and acquaintances.
 
 
 79
 Court: Was this part of the collateralized funding program?
 
 
 80
 Witness: Yes, yes.
 
 
 81
 Court: I see, and did these people who made loans for the collateralized funding program, did they know that that was to be used as a down payment on these two residences?
 
 
 82
 Witness: They knew that I had obtained the funding for the purchase of the homes, yes. I told them I was purchasing the homes.
 
 
 83
 Court: So the people who put money into your collateralized funding program were advised that that money was to go to a commitment fee for you to purchase these two residences.
 
 
 84
 Witness: Yes, because it was necessary for me to have a project in order to obtain the funding that I was seeking.
 
 
 85
 Court: All right.
 
 
 86
 E.R. 60-63.
 
 A federal judge has
 
 87
 broad discretion in supervising trials, and his or her behavior during trial justifies reversal only if it abuses that discretion. A trial judge is more than an umpire, and may participate in the examination of witnesses to clarify evidence, confine counsel to evidentiary rulings, ensure the orderly presentation of evidence, and prevent undue repetition. A judge's participation justifies a new trial only if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality.
 
 
 88
 United States v. Laurins, 857 F.2d 529, 537 (9th Cir.1988), cert. denied, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989) (citations omitted); see also Duckett v. Godinez, 67 F.3d 734, 739 (9th Cir.1995); United States v. Mostella, 802 F.2d 358, 361 (9th Cir.1986). Where, as here, the defendant neither objected nor moved for a mistrial, the district judge's comments from the bench are reviewed for plain error, which will be found "only in exceptional circumstances when a substantial right of a defendant is affected." United States v. Springer, 51 F.3d 861, 864 n. 1 (9th Cir.1995); United States v. Spencer, 1 F.3d 742, 746 (9th Cir.1993); United States v. Sanchez-Lopez, 879 F.2d 541, 551 (9th Cir.1989). (In fairness, it should be noted that a defense lawyer will have a difficult time objecting to this sort of questioning by the judge.) The trial judge's questions here reveal no bias, and the questions he asked were plainly intended to clarify the factual matters to which Jamison testified. While the judge's questions were lengthier and more detailed than one would normally expect in this situation, there was no plain error here.
 
 3. Commentary on the "good faith" defense
 
 89
 Next, Jamison argues that the district judge "severely undercut" her " 'good faith' defense by ridiculing it" in front of the jury. Appellant's Br. at 23. A review of what the district judge actually said makes clear that Jamison's contention is not persuasive. Her lawyer was trying to show that she had acted in good faith, by bringing out the fact that she had consulted an attorney:
 
 
 90
 Q. Did there come a time when you sought [an attorney's] legal advice involving these funding ventures which you have been testifying to?
 
 
 91
 A. Yes.
 
 
 92
 Q. And was he able initially at all to give you any advice as to--legal advice, on your funding ventures?
 
 
 93
 A. Well, in the beginning he was....
 
 
 94
 E.R. 64. The prosecutor made a hearsay objection. With the jury present, E.R. 65, the district judge and defense counsel then discussed the matter:
 
 
 95
 Court: What are you trying to elicit here? What are you going to do?
 
 
 96
 Defense: Your Honor, again, I'm trying to elicit the advice that Attorney Hansen gave to my client that the collateralized funding program, that what we now know as collateralized funding program, was both legitimate and was do-able, and that....
 
 
 97
 Court: Well, I'll tell you where the problem arises. The problem arises in setting forth a predicate. You're talking about state of mind.
 
 
 98
 Defense: That's right, your Honor.
 
 
 99
 Court: That's what you're trying to do.
 
 
 100
 Defense: That's right.
 
 
 101
 Court: All right. Do we know exactly what Mr. Hansen was told about the collateralized funding program, in quotes? That's the problem.
 
 
 102
 Defense: I can ...
 
 
 103
 Court: See, because we can have, you know, you can go to a lawyer and say: If I make a withdrawal from the bank, is that perfectly legal? Sure. Forget to tell the lawyer that you intend to make the withdrawal with a .45 automatic and no account.
 
 
 104
 Defense: Yes, your Honor.
 
 
 105
 Court: You see what I'm saying? That's an absurd example, but it shows up that one lawyer may give some advice based on a certain set of facts, and then the facts as presented may not be exactly the same.
 
 
 106
 Defense: Yes, your Honor. Perhaps I could lay additional foundation now with Mrs. Jamison in this regard.
 
 
 107
 Court: All right.
 
 
 108
 E.R. 64-65.
 
 
 109
 As noted above, a federal judge has broad discretion in supervising trials, see Laurins, 857 F.2d at 537, and, where no objection is made, the judge's remarks will be reviewed only for plain error. Springer, 51 F.3d at 864 n. 1. In this case, Judge Ezra's point was simply that Jamison's lawyer would have to lay a proper foundation before pursuing his line of questioning. There was no objection to the judge's example, and any prejudice it might hypothetically have caused was surely cured when the judge himself, only a moment later, noted that the example was "absurd." There was no plain error here.
 
 4. Other comments
 
 110
 Finally, Jamison argues that the district judge displayed bias by finding, only a few days into the trial, that there was "substantial evidence" of Jamison's guilt, and by opining that the jury might view Jamison as "obstreperous" because she would not stipulate to the admission into evidence of certain bank records. Appellant's Br. at 22. Once again, the record tells a different story.
 
 
 111
 The "substantial evidence" comment came outside the presence of the jury, in the context of the judge's ruling on Jamison's "vouching" objection. Denying her motion for a mistrial on that basis, the judge said this:
 
 
 112
 [H]ere is what I'm going to do: In the context of this case, there is no question that there is substantial evidence--there has been substantial evidence presented thus far, and the case is only a few days old--of the defendant's guilt; that does not mean that the Court has formed an opinion. I'm just saying that there is substantial evidence here by which a reasonable jury could find the defendant guilty beyond a reasonable doubt already in the record.
 
 
 113
 E.R. 26.
 
 
 114
 The argument that the judge displayed bias by suggesting that the jury might view Jamison as "obstreperous" is also unpersuasive. For one thing, Jamison's brief barely mentions the matter and her excerpts of record do not contain the relevant pages of the transcript. That alone justifies ignoring the argument. See 9th Cir.R. 30-1.3(a)(xi); Alonso, 48 F.3d at 1544. In any event, the government has provided the relevant pages in its supplemental excerpts, and they show that the trial judge did nothing improper. The comment was made outside the presence of the jury, in the course of an apparently lengthy session dealing with the admission of bank records. The judge was merely making a suggestion to Jamison's lawyer:
 
 
 115
 Well, I'm mystified, quite candidly, as to why the defendants, if these documents are what they purport to be, don't stipulate them into evidence because it's clear that they're all business records and they all--these are--they're income tax counts here. So, I--I'm mystified. And I have found in my years on the federal bench, that juries generally are smart enough to recognize a waste of time, and they generally don't take it very kindly, and they're not stupid. So, generally, it doesn't inure to the defendant's benefit to drag something out, even though I'm very careful not to indicate--and I haven't--that the defendants are refusing for reason [sic] that mystify me to consent these documents into evidence. The jury figures it out for themselves. And so--I--I mean--I don't know what kind of tactic this is, but it's the kind of thing that backfires regularly.
 
 
 116
 So, unless there is some legitimate, honest, reason why counsel believes these documents should be challenged, and has some legitimate basis on which to challenge them--and if you do, that's fine, and you have every right to do that--but simply to make [the prosecutor] go through this exercise with the jurors sitting here watching it I don't think will benefit the defendants. So, I--you know--I just throw that out as a caution because I've heard the jurors. I know what they have to say later in trial after trial, and they pick it up. I mean, they know what's going on and it doesn't benefit the defendants. I mean, I just--they just--they see it as obstreperous.
 
 
 117
 Defense: Well, Your Honor, in defense of this tactic, Karola Jamison has an absolute right to have the government prove--
 
 
 118
 Court: Sure. Of course.
 
 
 119
 Defense: --the case beyond a burden of proof.
 
 
 120
 Court: Absolutely.
 
 
 121
 Defense: She doesn't have to stipulate to anything.
 
 
 122
 ....
 
 
 123
 Court: ... I'm not suggesting she has to do anything. She has an absolute right to require the government to put on the evidence, and I have not made any comment in front of the jury to indicate otherwise. Quite the opposite is true. I'm just telling you that you have a jury here who's [sic] going to be sitting here for many weeks and by not stipulating to things which are obvious, the jury could, in spite of all the Court's admonitions to the contrary, find that for reasons mystifying to them even, the defense is simply making things tougher on them. You understand what I'm saying?
 
 
 124
 Supp.E.R. 25-28. Jamison's lawyer then assured the judge that his refusal to stipulate to the admission of certain documents was a considered decision and that he would stick with it, E.R. 28, to which the judge replied:
 
 
 125
 Court: All right. And I'm not suggesting and I'm not forcing you or suggesting that you do otherwise. I'm just saying that you have to very carefully--you know--in a long trial like this, you have to very carefully measure where you are going to push the button and where you are not. Because if the--my concern is--and I say this because of my concern for the right of the defendants to a fair trial--is that if you put the brakes on constantly, you could leave the jury with the impression that the defendant is simply, for no other reason than to avoid the ultimate outcome of the case, dragging things along, making it more difficult for them.
 
 
 126
 ....
 
 
 127
 Court: Okay. I made my statement. That's all I'm going to say. I mean, I'm not arguing and I'm not pressuring you to do something else.
 
 
 128
 Supp.E.R. 29-30.
 
 D. Flawed jury instruction
 
 129
 Counts 11 through 30 of the indictment charged Jamison with wire fraud, E.R. 10-13, and the instruction on those counts required that, to convict, the jury had to find, among other things, that Jamison had "used, or caused to be used, an interstate communications facility that is any means of wire, radio, or television communication in interstate commerce to carry out or attempt to carry out the scheme." E.R. 86. The instruction was flawed with respect to Count 22, Jamison argues, because that count alleges wire fraud by means of a telephone call between Hawaii and California, E.R. 12, and the wire fraud instruction does not define the use of a telephone as a "wire communication." The judge noted this deficiency when the instructions were settled:
 
 
 130
 There's one other thing I wanted to bring to the parties' attention. We neglected to put a sentence in there which is almost always there, and I don't know how it dropped off, but sometimes it does; that, as a matter of law, a telephone is a wire communication. That isn't in there anywhere. "Telephone" is not defined as a wire communication.
 
 
 131
 E.R. 68. The prosecutor thought the omission minor, and Jamison's lawyer did not object.
 
 
 132
 As there was no objection to the instruction at trial, this court reviews only for plain error, which will be found only where necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process. United States v. Ponce, 51 F.3d 820, 830 (9th Cir.1995); United States v. Vincent, 758 F.2d 379, 383 (9th Cir.), cert. denied, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985). It is unclear how the court's failure to define a telephone call as a "wire communication" with respect to one count could constitute a miscarriage of justice in this case. The trial court instructed the jury as to the elements of the offense. It simply failed to go a step further: it did not instruct the jury that, as a matter of law, one of those elements was satisfied.
 
 
 133
 That was not plain error. It is difficult to see what prejudice Jamison could have suffered from the court's failure to instruct the jury that the telephone call was, as a matter of law, a "wire communication." The jury obviously reached that conclusion anyway: it convicted Jamison on Count 22, and could have done so only if it concluded that the telephone call underlying that count was indeed a "wire communication."[7]
 
 IV. The sentence
 A. Overview
 
 134
 At sentencing, the district judge found that Jamison was an "organizer" or "leader" of a criminal activity, and increased her offense level by two levels pursuant to Sentencing Guideline § 3B1.1(c). E.R. 71-77. A § 3B1.1(c) enhancement was proper only if more than one person was "criminally responsible" for the offense, see United States v. Anderson, 942 F.2d 606, 615-17 (9th Cir.1991) (en banc), and was therefore improper in this case, Jamison argues, because there was no evidence that any of the other individuals involved in the scheme had any criminal intent. Appellant's Br. at 25-26; Appellant's Rep.Br. at 4-5.
 
 
 135
 The government had to prove by a preponderance of the evidence that Jamison was an organizer or leader, see Alonso, 48 F.3d at 1545, and that at least one person whom she organized or led was criminally responsible for the offense. See Anderson, 942 F.2d at 615-17; United States v. Howard, 894 F.2d 1085, 1090 (9th Cir.1993) (government must prove by a preponderance all facts necessary to determine the base offense level). The trial court's determination that the government carried that burden is reviewed for clear error. Ponce, 51 F.3d at 826.
 
 
 136
 B. The basis for the enhancement and the proceedings below
 
 
 137
 The propriety of a § 3B1.1(c) enhancement was argued at sentencing, and turned on the contention in the presentence report that
 
 
 138
 while soliciting funds from investors in December, [Jamison] instructed [Richard] Pryke to pay off other investors. At this point, Pryke became aware that the collateralized funding program was merely a scheme to defraud investors of their money. However, upon [Jamison's] instructions, [Pryke] continued to solicit investors so he and others could recover the funds they had already invested in the program.
 
 
 139
 PSR p 21.[8] On that basis, the probation officer recommended a § 3B1.1(c) enhancement: "[a]t the very least, Richard Pryke was criminally involved in this scheme as at some point, he became aware of the illegitimacy of the collateralized funding program but continued to assist [Jamison] under her direction in defrauding others." Id. p 46.
 
 
 140
 Jamison objected to this portion of the PSR, arguing that Pryke never testified that "he collected money for the program after he became convinced" that it was a fraud. PSR at 3A (emphasis added). Jamison made the same objection at sentencing, explaining that Pryke, once he "questioned the credibility" of the program, Transcript of Proceedings, November 28, 1994, 10:13 a.m. ("Tr.") at 27, had attempted to get money back from Jamison, but had not solicited any new investments. Tr. at 29-30. The prosecutor, Osborne, had a different recollection of Pryke's testimony, and the following exchange took place:
 
 
 141
 Prosecutor: Your Honor, my recollection of Mr. Pryke's testimony was that he clearly never admitted that he was a co-schemer, but he did testify that, in December, as the scheme was coming to its ultimate collapse, he collected moneys from other individuals, went to the Jamison offices, and realized that those moneys were then being distributed to earlier investors, and even going into the operation of the Jamison business.
 
 
 142
 That didn't carry with it the magic words, "I knew I was a co-schemer," but he clearly knew that the money was not going into any trust account at that time.
 
 
 143
 The Court: And he solicited funds thereafter?
 
 
 144
 Prosecutor: Yes, Your Honor.
 
 
 145
 Defense: I would object to that part. As far as Mr. Osborne--
 
 
 146
 The Court: My recollection is that he did admit he solicited funds after December.
 
 
 147
 Defense: Well, we will have to look at the transcript. My memory is that, Mr. Osborne is correct, that Mr. Pryke did at some point in December come to a realization that investor money--
 
 
 148
 ....
 
 
 149
 The Court: Well, in any event, the court finds that the presentence report is correct. I think Mr. Osborne has correctly recollected the testimony and the evidence in this case.
 
 
 150
 There is no question that, after Mr. Pryke left the stand, I had the clear impression that Mr. Pryke was well aware, at one point in time, before he had stopped actively soliciting--now, he was winding down, but he was aware that there was something very wrong going on, and yet he continued to actively solicit.
 
 
 151
 Now, it's true that his testimony was that he was soliciting in an effort to get other people money back; but, nonetheless, he was nonetheless bringing in additional money. He was essentially, if you will, taking from Peter to pay Paul, which is the essence, after all, of a Ponzi scheme--
 
 
 152
 Defense: I understand what the court's saying. I disagree. I believe he said that he was trying to get money out of the program, not bringing any more money into the program.
 
 
 153
 The Court: Well, okay. That's the court's ruling.
 
 
 154
 Tr. at 28-30 (emphasis added).
 
 
 155
 The judge took the same view later in the proceedings, when paragraph 46 of the PSR came up, explaining that
 
 
 156
 there's no question that had the government chosen, in my view, to indict Mr. Pryke, he was indictable and convictable on this offense. As a matter of fact, Mr. Pryke pled guilty to bank fraud charges in connection with this scheme. He took out loans in order to finance his purchases, and gave false information. And, having prosecuted him for that, the government chose not to prosecute him here, in addition to which he was cooperating with the government.
 
 
 157
 But that does not mean that Mr. Pryke was not indictable. I mean, there's no question in my view that the evidence showed that he was aware, at the end, of what went on, and did not disengage himself from the activity.
 
 
 158
 Now, it's true that he attempted to characterize his involvement as getting money back, but in order to get money back, he was going out and getting more investors using the same scheme....
 
 
 159
 The fact of the matter is when Mr. Pryke went out and got additional investors in this scheme, even if his motive was to pay people back, he, in fact, was violating the law, because he got that money by false pretenses.
 
 
 160
 In my understanding, and my recollection ... is that that's exactly what his testimony was, that he was out there trying to get this money--that he actually went out and procured some additional sources after he was aware in December that things were not right.
 
 Tr. at 73-75 (emphasis added).[9]
 
 161
 Jamison's argument is straightforward. The district judge, relying on his recollection of Pryke's testimony, held that an enhancement was appropriate because Pryke had solicited new investments even after learning in December 1989 that Jamison's scheme was a scam.[10] But Pryke, Jamison insists, did not solicit additional investments after discovering in December 1989 that the program was a fraud; the district court's finding that he did was simply incorrect. See Appellant's Br. at 27 n. 4.
 
 
 162
 The question, then, is whether Pryke's testimony showed that he solicited investments for Jamison's scheme after becoming aware, as the judge put it, that "things were not right." The district judge's finding that it did will be upheld unless this court "is left with the definite and firm conviction" that a mistake has been made. United States v. Ferrin, 994 F.2d 658, 662 (9th Cir.1993).
 
 C. Analysis
 
 163
 1. The stated basis for the sentence enhancement
 
 
 164
 Judge Ezra's remarks make it abundantly clear that he based the sentence enhancement on his factual finding that Pryke solicited new investors, or at least new money from existing investors, after December 1989. We could find no evidence in the excerpts of record to support the district court's factual finding. We then requested the complete record, and read all of Pryke's testimony. See 3 R.T. at 152-190; 4 R.T. at 1-84. Again, we could find no evidence to support the district court's factual finding.
 
 
 165
 Pryke did make various admissions from which one might conclude that he was aware that the funding program was a fraud. The problem with his testimony is that he seldom specified dates, and it is therefore impossible to tell precisely what the sequence of events was. Pryke testified, for example, that various investors, after several months without any payments, "started to get pretty antsy," 3 R.T. at 178, and that Jamison would give him money "to pay the people who were making the most noise." Id. At one point, he made "interest" payments to certain participants in the scheme from money given to him for "investment" purposes. Id. at 181. At another point, Pryke knew that a lawyer was involved and that the funding scheme was under investigation. See 4 R.T. at 22-23. But nothing in Pryke's testimony suggests that he solicited new investments for the program after learning it was a fraud.[11]
 
 
 166
 2. Alternative bases for upholding the sentence
 
 
 167
 Rather than point to any evidence in the record which would support the district court's underlying factual finding, and hence its § 3B1.1(c) enhancement, the government offers us a pastiche of irrelevancies. It suggests that the enhancement can be upheld on at least four grounds: first, because plenty of others, aside from Pryke, were "criminally responsible" for the fraud, Appellee's Br. at 31; second, because the fraud was, in any event, "otherwise extensive" within the meaning of § 3B1.1(a) and (b), so Jamison ought to be thankful she did not receive a greater enhancement under those provisions of the guideline, id. at 33-34; third, because Pryke had pled guilty to a related charge of bank fraud; and, fourth, because Pryke, at some unspecified date, "disbursed investor money for purposes other than the purpose for which the money had been solicited." Id. at 31.
 
 
 168
 None of those arguments is persuasive. The first two may be disposed of quickly. The district court enhanced Jamison's sentence because it found that Pryke was "criminally responsible" for Jamison's offenses. That other individuals may also have been "criminally responsible" for them is irrelevant. Moreover, whether Jamison's activity was "otherwise extensive" within the meaning of guidelines § 3B1.1(a) or (b) is also irrelevant, because the enhancement was made pursuant to § 3B1.1(c).
 
 
 169
 a. Pryke's related conviction for bank fraud
 
 
 170
 Pryke's related conviction for bank fraud also could not support Jamison's sentence enhancement. That fraud had to do with statements Pryke made in May 1989, while seeking to obtain bank loans for himself, the proceeds of which he invested in Jamison's program. See 4 R.T. at 37. As Jamison's lawyer made clear when he cross-examined Pryke, this was one instance of fraud with which Jamison had nothing to do. Id. at 51. Pryke could not, on the basis of this independent act of bank fraud, be deemed "criminally responsible" for Jamison's mail and wire fraud offenses, especially since the district court itself indicated that Pryke realized only six months later, in December 1989, that the program was a fraud.
 
 
 171
 b. The government's "improper disbursement" theory
 
 
 172
 The government's primary argument in defense of Jamison's sentence enhancement is that Pryke "disbursed investor money for purposes other than the purpose for which the money had been solicited." Pryke, the government tells us, improperly used money invested by Barry Warren (one of the victims of the fraud) to placate another investor, Richard Powell, who was demanding to be repaid. And, the government explains, we can deduce that he did so after December 1989 by looking at the checks themselves, at Exhibit 900 (the summary chart of the checking account), and at Warren's testimony. There are two problems with this argument.
 
 
 173
 First, as noted above, Judge Ezra based the enhancement on Pryke's alleged solicitation of money for investment, not on his improper distribution of money already invested. That Pryke improperly disbursed investors' money might support an inference that he knew the program was a fraud, but has nothing to with the question whether he thereafter solicited new investments.
 
 
 174
 Second, the "improper disbursement" theory, considered on its merits, is not supported by the evidence. Here, in relevant part, is what Pryke, Warren and Powell had to say:
 
 
 175
 (1) Pryke's testimony
 
 
 176
 Q: When, if ever, did you have conversations with Mrs. Jamison concerning the payment of interest after--out of funds you had received from an investor?
 
 
 177
 A: I can remember specifically I had--I had received $10,000 from Barry Warren, and I was on alert up in March Air Force Base, and when I got back I spoke with Karola, and I told her there were a number of people who needed to be paid, and one in particular, Dick Powell, had put in five--$5,000 and was due his--overdue his payment of $5,000 plus the interest, and he was--he worked on--you know--right along side of me, and I wanted to make sure that he was happy, so I asked Mrs. Jamison where I could get the money to pay them, and she said: Take the $10,000 that I got from Barry Warren and split it up amongst the people and so that's what I did.
 
 
 178
 Supp.E.R. at 4.
 
 
 179
 (2) Warren's testimony
 
 
 180
 Barry Warren first heard of the funding program through Pryke in the summer of 1989, and invested $10,000, through Pryke, on August 20, 1989. He was to be repaid on October 5. He wasn't paid, and, after getting the "run around" from Pryke, Warren eventually spoke with Karola Jamison in late December 1989 and with Marc Jamison in January 1990. Tr., July 6, 1994, at 102-07.
 
 
 181
 (3) Powell's testimony
 
 
 182
 Richard Powell testified that he invested $20,000 in Jamison's scheme. VIII Tr. at 21. (He made the investment in early August 1989. E.R. 50.) He also testified that he received personal checks from Pryke for a total of $1,750, VIII Tr. at 22, but did not indicate when he received them.
 
 
 183
 Taking Pryke's, Warren's and Powell's testimony together, what we know is this: Warren invested his money on August 20, 1989; Pryke diverted some of that money to pay Powell, but did not say when he did so; similarly, Powell received personal checks from Pryke, but did not say when he received them. The checking account records as summarized in Exhibit 900 tell us nothing on this point. (As noted above, the checks themselves are not part of the record.) Ultimately, then, we cannot tell, on the record before us, whether Pryke used Warren's money to pay Powell before or after Pryke learned, in December 1989, that the scheme was a fraud.
 
 
 184
 In sum, the government has not carried its burden of proof. Judge Ezra based the enhancement on Pryke's solicitation of new investments after December 1989. The government has pointed to no evidence at all suggesting that Pryke engaged in such solicitation. Pryke's conviction for bank fraud cannot support the enhancement. Finally, the government's attempt to justify the enhancement on the basis of Pryke's improper disbursement of investors' money fails, because the government has pointed to no evidence indicating that Pryke engaged in any such disbursement after he learned the funding program was fraudulent.
 
 V. Conclusion
 
 185
 For the reasons stated above, we AFFIRM Jamison's conviction, VACATE her sentence, and REMAND the case for resentencing.
 
 
 
 *
 The Honorable Edward C. Reed, Jr., Senior United States District Judge, District of Nevada, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 This summary is taken from Jamison's brief, at 5-8, and the Government's brief, at 3-11. Given the issues on appeal, the factual background is important only as context
 
 
 [2]
 By contrast, a prosecutor's reference to plea agreements does not constitute vouching at all if it comes "after defense counsel uses them to attack the credibility of the witnesses." United States v. Perez, 67 F.3d 1371, 1379-80 (9th Cir.1995) (citing United States v. Monroe, 943 F.2d 1007, 1013-14 (9th Cir.1991), cert. denied, 503 U.S. 971, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992)). This emphasis on the timing of any mention of the truthfulness requirement is apparently unique to the Ninth Circuit, see Necoechea, 986 F.2d at 1280 n. 4, and even in this circuit it is not crucial: "what was said is more important than when it was said, at least ... where an attack on the witness'[s] credibility was almost certain to be forthcoming." Id. at 1278 n. 2 (quoting United States v. Shaw, 829 F.2d 714, 717 (9th Cir.1987), cert. denied, 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988)). A prosecutor does vouch, then, by bringing out the truthfulness requirement before the witness's credibility has been attacked, but, at least if such an attack was clearly coming anyway, any harm done can likely be cured with an instruction to the jury. In this case, it was reasonably clear before Pryke took the stand that the defense would use his plea agreement to impeach him, see Supp.E.R. 2-3, and that is precisely what Jamison's attorney did on cross. Supp.E.R. 35-38
 
 
 [3]
 The FBI agent also made some mention of testimony, E.R. 35, but Jamison states, Appellant's Br. at 18, and the government does not dispute, that the sixteen individuals who issued these twenty-two checks did not testify
 
 
 [4]
 She objected because the chart allegedly incorporated hearsay from the checking account records, not because the FBI's characterization of certain deposits as "investments" was based on hearsay from the individuals whose money was deposited. See United States v. Rivera, 43 F.3d 1291, 1295 (9th Cir.1995) (quoting United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir.), cert. denied, 498 U.S. 947, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990)) ("a party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection, ... but also by making the wrong specific objection")
 
 
 [5]
 The government claims, see Appellee's Br. at 21, and Jamison does not dispute, that there was a hearing outside the presence of the jury at which she could have made these objections
 
 
 [6]
 Jamison claims that the district judge interrupted her direct testimony "on at least four separate occasions," Appellant's Br. at 22, but in her brief discusses only the incident set out below. Her argument with respect to the other three incidents consists of a citation to transcript pages. Id. As Jamison completely fails to describe or discuss those incidents in her brief, and has not provided any excerpts of record relating to them, they need not be considered. See 9th Cir.R. 30-1.3(a)(xi) (excerpts of record must contain "specific portions of any documents in the record that are cited in appellant's brief and necessary to the resolution of an issue on appeal"); Jones v. Gomez, 66 F.3d 199, 204 & n. 1 (9th Cir.1995) (affirming denial of habeas where, among other things, "[n]o relevant document" appeared in the excerpt of record); United States v. Alonso, 48 F.3d 1536, 1544 (9th Cir.1995) (an issue given only "perfunctory treatment" in an appellate brief need not be considered)
 
 
 [7]
 One court has suggested that it might have been error to include in the instruction the very language Jamison argues should have been included. See United States v. Johnson, 718 F.2d 1317, 1325 n. 23 (5th Cir.1983) (en banc) (error to instruct a jury that a telephone call is, as a matter of law, a wire signal)
 
 
 [8]
 The presentence report is a sealed document, but its discussion of a § 3B1.1(c) enhancement based on Pryke's activities was discussed in open court
 
 
 [9]
 The district court had this to say about the applicable law:
 There is no question that as, one, a clever puppeteer might manipulate a host of marionettes, so, too, Mrs. Jamison manipulated the people whom she had spread out through the military establishment in Hawaii to assist her in this scheme.
 It isn't necessary under the law, in my view, that these people have been indicted, because, if that were the case, then anyone who was clever enough to have a scheme in which they controlled numbers of individuals in order to have them perform functions, even if those individuals were were [sic] unwitting performers, would escape the onus of this provision, when it is precisely that kind of direction which counts.
 Tr. at 73-74.
 That is partially correct. It is true that the propriety of a § 3B1.1(c) enhancement for Jamison would not depend on whether the people whom she manipulated were indicted. See U.S.S.G. § 3B1.1, comment. (n. 1) (one can be criminally responsible without being convicted). The district court erred, however, when it suggested that an enhancement would be proper even if the people Jamison organized or led were themselves unwitting dupes. Though Jamison's use of innocent individuals as "unwitting performers" may indicate that her scheme was "otherwise extensive," and might therefore have supported an enhancement under § 3B1.1(a) or (b), see, e.g., United States v. Roberts, 5 F.3d 365 (9th Cir.1993), her offense level was enhanced pursuant to § 3B1.1(c), and that was proper only if at least one person whom she organized, led, managed or supervised was "criminally responsible" for the offense. See Anderson, 942 F.2d at 615-17. In any event, the error was harmless, as the district court found that Pryke was in fact "criminally responsible," rather than an "unwitting performer."
 
 
 [10]
 Pryke's actions before that time are irrelevant under § 3B1.1(c), because the enhancement was proper only if he was "criminally responsible" for "the offense" (mail and wire fraud). Good faith is a defense to charges of mail and wire fraud. If, as the court itself stated, Pryke learned only in December 1989 that the program was a fraud, then he could be criminally responsible only for his actions after that date. See United States v. Jackson, 26 F.3d 999, 1000 (10th Cir.1994) (citing United States v. Lamont, 565 F.2d 212, 227 (2d Cir.1977), cert. denied, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978))
 
 
 [11]
 Pryke used exhibits while testifying, and it may be that his testimony was more intelligible in conjunction with those exhibits. For example, Pryke apparently maintained a complete record, received into evidence as Exhibit 106.1, of his dealings involving the collateralized funding program. See 3 R.T. at 172-73. That document, and perhaps others referred to during his testimony, may contain information which supports the district court's finding that Pryke solicited new investors after learning that the program was a fraud. Unfortunately, there is no way to tell. We requested and received what the clerk of the district court designated as the "complete record" in this case. That record did not include the exhibits. We were informed by the clerk of the district court that the practice in the District of Hawaii is to return the exhibits to the parties